**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON**

**BRADLEY OLEY LESTER,**

     **Petitioner,**

**v.**                                **Case No. 2:12-cv-00224**

**DAVID BALLARD, Warden,
Mount Olive Correctional Complex,**

     **Respondent.**

**PROPOSED FINDINGS AND RECOMMENDATION**

On February 1, 2012, the petitioner filed a Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254.  (ECF No. 2.)  This matter is assigned to the Honorable Joseph R. Goodwin, United States District Judge, and it is referred to the undersigned United States Magistrate Judge for submission of proposed findings and a recommendation for disposition, pursuant to 28 U.S.C. § 636(b)(1)(B).

Pending before the court are the petitioner's Motion to Allow Discovery (ECF No. 29) and the respondent's Motion for Summary Judgment (ECF No. 15).  In the course of briefing the petitioner's Motion for Discovery, the respondent raised, for the first time, and in a footnote, a challenge to the timeliness of the petitioner's section 2254 petition.  The discovery motion has been addressed in a separate order.  Prior to proposing rulings on the merits of the petitioner's claims for habeas corpus relief, the undersigned believes it is necessary to address the respondent's challenge to the timeliness of the section 2254 petition.

## PROCEDURAL HISTORY

During the September 2004 term, a Mingo County Grand Jury returned a single-count indictment charging the petitioner with the murder of William Bert Davis near Spice Creek in Mingo County, West Virginia.  (*State v. Lester*, Case No. 04-F-61).  After a three-day jury trial, the petitioner was convicted of one count of Murder in the First Degree without mercy.  On March 7, 2005, the petitioner filed post-trial motions, which were denied by the trial court on March 14, 2005.  That same date, the trial court sentenced the petitioner to life in prison, without the possibility of parole.

On October 31, 2005, the petitioner filed a Petition for Appeal in the Supreme Court of Appeals of West Virginia (the "SCAWV"), asserting the following assignments of error:

1. The trial court erred in failing to require that the State clearly identify the issue or issues to which the 404(b) evidence was relevant.

2. The State's rationale for admission of the 404(b) evidence was vague, conclusory, and unpersuasive, and should have been rejected by the trial court.

3. The testimony of Early Stewart was an insufficient basis for admission of the 404(b) evidence.

4. The trial court's limiting instructions were insufficient to cure the unfair prejudice created by the use of the 404(b) evidence.

(*State v. Lester,* Case No. 052443).  By order entered January 26, 2006, the SCAWV summarily refused the petitioner's Petition for Appeal.  Under the SCAWV's rules in effect at that time, because the court summarily refused the Petition for Appeal, no mandate issued.  On February 6, 2006, the petitioner filed a motion to renew, out of time, his petition for appeal.  The parties herein have construed that motion as a petition for rehearing; however, because the SCAWV did not hear the petitioner's

petition, there was nothing to re-hear.  On May 11, 2006, the SCAWV refused the motion to renew, out of time, the petition for appeal.[1]  The petitioner did not file a Petition for a Writ of Certiorari in the Supreme Court of the United States.

On June 22, 2006, the petitioner filed a *pro se* Petition for a Writ of Habeas Corpus in the Circuit Court of Mingo County.  (Case No. 06-C-199).  (ECF No. 15, Ex. 1.)  That petition raised the following grounds for relief:

1.  The petitioner was denied effective assistance of counsel.  (This ground for relief contains 12 sub-parts.)

2.  The failure of the State to preserve DNA material taken from the petitioner's pants constitutes a denial of his right to a fair jury trial.

3.  The State failed to disclose exculpatory evidence in violation of the petitioner's state and federal due process rights.  (This ground for relief contains five sub-parts.)

4.  The petitioner contends his due process rights to a fair and impartial jury trial were violated when the trial court allowed the State to present the jury with gruesome photographs of the victim.

5.  The petitioner contends his due process rights to a fair and impartial jury trial were violated when the trial court failed to grant a change of venue due to excessive pre-trial publicity.

6.  The petitioner contends his due process rights to a fair and impartial jury trial were violated when the trial court permitted the State's rationale for admission of 404(b) evidence was relevant and plausibly articulated how the evidence was relevant.

7.  The petitioner contends his due process rights to a fair and impartial jury trial were violated when the trial court permitted the State's rationale for admission of 404(b) evidence that is vague, conclusory and unpersuasive.

---

[1]  None of these documents were included in the exhibits filed with the respondent's Motion for Summary Judgment.  In his Memorandum of Law in support of the Motion for Summary Judgment, the respondent's counsel has indicated that he requested the direct appeal documents from the Clerk of the SCAWV, but they were not provided to him.  (ECF No. 19 at 3 n.1.)  However, the undersigned's staff has obtained the order denying the motion to renew the petition to verify the actual nature of the motion and the date of entry of the order denying the same.  The parties' briefs incorrectly stated that the order refusing the motion to renew the petition was entered on March 11, 2006.

8.   The petitioner contends his due process rights to a fair and impartial jury trial were violated when the trial court admitted the insufficient testimony of Early Stewart and used it as a basis for admission of 404(b) evidence.

9.   The petitioner contends his due process rights to a fair and impartial jury trial were violated when the trial court's limiting instructions were insufficient to cure the unfair prejudice created by the use of the 404(b) evidence.

10.   The petitioner argues the trial court violated his federal and state constitutional rights to be free from unreasonable searches and seizures by denying his motion to suppress DNA evidence.

11.   The petitioner contends his due process rights to a fair trial were violated because of the cumulative effect of numerous reversible trial errors.

(*Id.*)

On June 29, 2006, the Circuit Court of Mingo County granted the petitioner's motion for appointment of counsel.   After several court-appointed attorneys had withdrawn, the petitioner retained Mark Hobbs to represent him on November 28, 2006.  On October 5, 2007, Mr. Hobbs filed an Amended Petition for a Writ of Habeas Corpus.  The copy of the Amended Petition produced by the respondent as an exhibit in this court is of poor quality and is very difficult to read.  (ECF No. 15, Ex. 2.)  However, according to the respondent's Memorandum of Law, and from a review of the Amended Petition itself, it appears that the Amended Petition contains the same grounds for relief as those raised in the *pro se* habeas corpus petition filed by the petitioner on June 22, 2006.  (*Id.*)

On November 2, 2007, Mr. Hobbs filed a motion for the production of the clothing allegedly worn by the petitioner on the night of the crime in order to have independent DNA testing performed.  An omnibus evidentiary hearing was held on October 29, 2007 (ECF No. 15, Ex. 3), and continued on five additional dates:  January

4

24, 2008 (*Id.*, Ex. 4), February 25, 2008 (*Id.*, Ex. 5), May 20, 2008 (*Id.*, Ex. 6),
September 30, 2009 (*Id.*, Ex. 7) and November 17, 2009 (*Id.*, Ex. 8.)  By order entered
February 9, 2010, the Circuit Court of Mingo County denied the petitioner's Petition for
a Writ of Habeas Corpus in its entirety.  (*Id.*, Ex. 9.)  The order denying the habeas
corpus petition also addressed and denied the petitioner's motion for additional DNA
testing.  (*Id.*)

On June 14, 2010, during the four-month period in which the petitioner could file
a Petition for Appeal from the denial of his state habeas petition, the petitioner first filed
a Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254 in this federal court.
(Case No. 2:10-cv-00819).  Without requiring a response from the respondent, on
September 15, 2010, the undersigned submitted a Proposed Findings and
Recommendation recommending that the presiding District Judge dismiss the federal
petition, without prejudice, for failure to exhaust state court remedies, because the
petitioner had not raised all of his claims for habeas corpus relief before the SCAWV,
and still had an opportunity to do so.  (Case No. 2:10-cv-00819, ECF No. 10.)  The
undersigned also recommended that the petitioner's request for a stay or abeyance of
the federal petition be denied.  (*Id.*)  On January 20, 2011, the Honorable Joseph R.
Goodwin adopted the undersigned's Proposed Findings and Recommendation, and
dismissed the petitioner's first federal petition without prejudice.

On September 15, 2010, while the petitioner's first federal petition was still
pending, the petitioner, by counsel, filed a Petition for Appeal in the SCAWV concerning
the denial of his Mingo County habeas corpus petition.  That petition asserted the
following grounds for relief:

1.      The court abused its discretion when it permitted the jury to hear evidence concerning the petitioner's previous guilty plea to second degree murder which occurred nine (9) years prior to the petitioner's arrest.

2.      The petitioner contends his due process rights to a fair and impartial jury trial were violated when the trial court permitted the State's rationale for admission of 404(b) evidence that is vague, conclusory and unpersuasive.

3.      The petitioner contends his due process rights to a fair and impartial jury trial were violated when the trial court admitted the testimony of Earl Stewart and used it as a basis for admission of the 404(b) testimonial evidence.

4.      The petitioner contends his due process rights to a fair and impartial jury trial were violated because the trial court's limiting instructions were insufficient to cure the unfair prejudice created by the use of the 404(b) evidence.

5.      The court erred in admitting gruesome photographs to the jury which inflamed their fears, emotions and passions.

6.      The petitioner contends the Circuit Court of Mingo County violated all the provisions of West Virginia Code Section 53-4A-7(c) of the West Virginia Post-Conviction Habeas Corpus Rules when the Honorable Michael Thornsbury, Chief Judge, failed to make specific findings of fact and conclusions of law in the circuit court's final order relating to all the cognizable grounds presented in the petitioner's petition for a writ of habeas corpus.

(ECF No. 15, Ex. 10.)  By Memorandum Decision entered March 11, 2011, the SCAWV affirmed the Circuit Court's rulings.  (*Id.*)

The petitioner then filed the instant section 2254 petition on February 1, 2012. (Case No. 2:12-cv-00224) (ECF No. 2.)  That petition raised the following grounds for relief:

1.      The petitioner contends his due process rights to a fair and impartial jury trial were violated when the trial court erred in failing to require that the State identify the issues to which the 404(b) evidence was relevant and, plausibly articulate how that evidence was relevant.

2.      The petitioner contends that his due process rights to a fair and impartial jury trial were violated when the trial court permitted the State's rationale for admission of 404(b) evidence that is vague, conclusory and unpersuasive.

3.      The petitioner contends his due process rights to a fair and impartial jury trial also were violated when the trial court admitted the insufficient testimony of Earl Stewart and used it as a basis for admission of the 404(b) testimonial evidence.

4.      The petitioner contends his due process rights to a fair and impartial jury trial were violated because the trial court's limiting instructions were insufficient to cure the unfair prejudice created by the use of the 404(b) evidence.

5.      The petitioner contends that his due process rights to a fair and impartial jury trial were violated when the trial court allowed the State to present the jury with gruesome photographs of the victim.

6.      The petitioner's trial counsel provided ineffective assistance of counsel in violation of the 5th, 14th and 6th Amendments to the United States Constitution by failing to provide expert testimony.

7.      The petitioner's rights under federal and state laws under the U.S. Constitution 14th Amend, due process to a fair trial were violated when the trial judge let the State change forensic document during trial.

8.      Due Process under the U.S. Constitution and State were violated 5th and 14th Amendments when prosecution failed to disclose a[n] <u>unknown</u> fourth statement to the defense before the start of trial.

(*Id.*)  The petitioner subsequently withdrew Grounds Seven and Eight.  (ECF Nos. 32, 38.)

When the petitioner filed his second section 2254 petition, he also filed a Motion for Appointment of Counsel.  (ECF No. 3.)  The undersigned initially denied that motion without prejudice (ECF No. 7), and ordered the respondent to file a response to the petition by March 2, 2012 (ECF No. 8.)  After being granted two extensions of time to file a response, on May 25, 2012, the respondent filed an Answer (ECF No. 14), a Motion

for Summary Judgment (ECF No. 15) and a Memorandum of Law in support thereof (ECF No. 19.)

The undersigned notes that the respondent's Answer specifically states as follows: "Based upon the procedural history as set forth in Respondent's memorandum of law, it appears that the present federal petition was timely filed within the one-year period of limitation prescribed by 28 U.S.C. § 2244(d)." (ECF No. 14 at 1.) The respondent's Motion for Summary Judgment further addresses the merits of each of the petitioner's grounds for relief, and does not assert any challenge to the timeliness of the petition.

On June 20, 2012, the petitioner filed a second Motion for Appointment of Counsel. (ECF No. 20.) Based upon assertions concerning the petitioner's mental health status, on June 22, 2012, the undersigned granted the petitioner's Motion for Appointment of Counsel, and appointed the Office of the Federal Public Defender to represent the petitioner in the instant proceedings. (ECF No. 23.) The undersigned also granted an extension of time until August 31, 2012 for the petitioner's newly-appointed counsel to respond to the pending Motion for Summary Judgment. (*Id.*) On August 29, 2012, the undersigned granted the petitioner a second extension of time until September 7, 2012 to file a response to the Motion for Summary Judgment. (ECF Nos. 27, 28.)

On September 7, 2012, the petitioner filed a Response in Opposition to the respondent's Motion for Summary Judgment (ECF No. 30), but also filed, *inter alia,* a Motion for Discovery (ECF No. 29) and a Memorandum of Law in support thereof (ECF No. 30.) The discovery motion seeks the production of the petitioner's clothing and swatches taken therefrom, in order to conduct independent DNA testing to support the

8

petitioner's claim of ineffective assistance of counsel for failing to conduct independent testing and to call an expert witness to rebut the State's evidence at trial.

The undersigned set a briefing schedule for the discovery motion and also set a deadline for the respondent to file a reply brief to the summary judgment motion. (ECF No. 28.) The undersigned also granted the petitioner's Motion to Expand the Record to permit the filing of the photographs of the victim, and the photographs of the petitioner's clothing taken on the night of his arrest. Although the undersigned granted the motion for production of the photographs of the victim and the petitioner's clothing, the undersigned denied the motion for expansion of the record to include the actual clothing items and the swatches taken therefrom. The undersigned took the petitioner's discovery motion under advisement pending further briefing.

On October 26, 2012, the respondent filed a Response Opposing the Motion for Discovery. (ECF No. 41.) For the first time in these proceedings, the respondent asserted that the petitioner's section 2254 petition is untimely. In particular, in a footnote spanning four pages, the respondent asserts that the undersigned's calculations concerning the one-year statute of limitations contained in the Proposed Findings and Recommendation in Case No. 2:10-cv-00819, with regard to the petitioner's first section 2254 petition, were incorrect, and that the petitioner's second section 2254 petition, filed on February 1, 2012, is untimely. (ECF No. 41 at 1-4 n.1.)

<u>**ANALYSIS**</u>

**A. The one-year statute of limitations under section 2244(d)(1).**

On April 24, 1996, a one-year limitation for filing of federal habeas corpus petitions was enacted as part of the Antiterrorism and Effective Death Penalty Act of 1996 ("the AEDPA"). The AEDPA provides, in part, that:

(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court.  The limitation period shall run from the latest of –

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or law of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1).  Section 2244(d)(2) further provides:

The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d)(2).

### *Calculation of the statute of limitations in the petitioner's case*

The respondent is correct that the undersigned's Proposed Findings and Recommendation (hereinafter "PF&R") in Case No. 2:10-cv-00819 contains an error concerning the calculation of the one-year statute of limitations under 28 U.S.C. § 2244(d)(1).[2]  The undersigned's previous PF&R stated as follows:

_____

[2]  Based upon the undersigned's understanding of the SCAWV's rules, the motion to renew, out of time, the petition for appeal filed by the petitioner on February 6, 2006, was not treated as a petition for rehearing, and did not affect the finality of the SCAWV's ruling refusing the petition for appeal, which was entered on January 26, 2006.  Thus, the undersigned did not include the time period in which that motion was pending in the calculation of the statute of limitations.  However, the undersigned mistakenly added another 90 days to the calculation under section 2244(d)(1).  The undersigned acknowledges this error in calculation.  Nevertheless, the undersigned notes that the respondent's argument concerning the timeliness of the instant petition also contains an error.  The respondent used the date of February 1, 2006 as the date the SCAWV refused the petitioner's direct appeal.  That was the date that the Circuit

10

Petitioner's direct appeal was refused on April 26, 2006. Petitioner then had 90 days in which to file a Petition for a Writ of Certiorari in the Supreme Court. According to his section 2254 petition, Petitioner did not file a Petition for a Writ of Certiorari. Accordingly, Petitioner's judgment became final on or about July 25, 2006, and the statute of limitations would have begun to run on July 26, 2006. However, by that date, Petitioner had already filed his Circuit Court habeas corpus petition, which tolled the statute of limitations. Accordingly, based upon the undersigned's calculation, the statute of limitations will not begin to run until the day after the SCAWV renders a decision on Petitioner's habeas corpus appeal. Petitioner is advised that, if he files a new section 2254 petition, he must raise any and all exhausted federal constitutional claims he may wish to pursue in that petition.

(Case No. 2:10-cv-00819, ECF No. 10 at 11-12.) Because the respondent had not been ordered to respond to this initial petition, and had not made an appearance in that matter, neither the respondent, nor his counsel, was served with this PF&R.

In a Reply to the respondent's Response in Opposition to the petitioner's Motion for Discovery (ECF No. 44 at 1-2), the petitioner, by counsel, asserts that a calculation of the statute of limitations should also include the fact that the petitioner filed a "Petition for Rehearing" in the SCAWV. Thus, the petitioner asserts that the 90 days in which the petitioner could have filed a Petition for a Writ of Certiorari should run from the date upon which the SCAWV denied the "Petition for Rehearing," or May 11, 2006 (mistakenly listed in the petitioner's brief as March 11, 2006). Accordingly, under the corrected version of the petitioner's calculation, the petitioner's criminal judgment would have become final on August 12, 2006.

In *Citizens' Bank v. Opperman*, 249 U.S. 448, (1919), the Supreme Court of the Unites States held that, where a petition for rehearing has been filed in the state court, the judgment of the state court becomes final for purposes of review in the federal

Court of Mingo County docketed the SCAWV's refusal order on the petitioner's criminal docket sheet. The date that the SCAWV entered the order refusing the petition, however, was on January 26, 2006, and that is the correct date to use for the calculation.

Supreme Court by certiorari, upon the denial or other disposition of the petition for rehearing.  Similarly, the West Virginia Rules of Appellate Procedure in effect at the time of the petitioner's criminal proceedings, provided that "[t]he timely filing of a petition for rehearing will stay the mandate until disposition of the petition, unless otherwise ordered by the Court.  If the petition is denied, the mandate shall issue seven days after entry of the order denying the petition unless the time is shortened or enlarged by order."  W. Va. R. App. P. 25(a) [amended as of December 1, 2010; now found in Rule 26].  The rules also make clear that a memorandum decision is not final until the mandate issues.  However, under the rules in effect at the time, as noted above, because no mandate issued upon the summary refusal of the Petition for Appeal, and because the motion to renew, out of time, the petition for appeal, was not treated as a petition for rehearing, the petitioner's appellate ruling was issued on January 26, 2006, and the 90 day period in which to file a Petition for a Writ of Certiorari ran from that date.

Therefore, a correct calculation of the one-year statute of limitations would be as follows:  The petitioner's judgment became final upon the expiration of the period for filing a Petition for a Writ of Certiorari, which was 90 days after the summary refusal of the petitioner's Petition for Appeal.  Thus, the petitioner's judgment became final on or about April 26, 2006.  Therefore, the one-year statute of limitations began to run on April 27, 2006 and ran until June 22, 2006, when the petitioner filed his Petition for a Writ of Habeas Corpus in the Circuit Court of Mingo County.  At that point, 57 days had passed under the statute of limitations.

The statute of limitations was then tolled until March 11, 2011, when the SCAWV ruled on the petitioner's state habeas appeal.  The statute of limitations then began to

run again on March 12, 2011 and ran uninterrupted until it expired on January 17, 2012.[3] Therefore, under this corrected calculation, the petitioner's instant section 2254 petition, which was filed on February 1, 2012, is untimely. Even taking into account the "mailbox rule," as set forth in *Houston v. Lack,* 487 U.S. 266 (1988), the petitioner executed and mailed his petition on January 30, 2012, which is 13 days after the expiration of the statute of limitations.

Accordingly, the undersigned proposes that the presiding District Judge **FIND** that the petitioner's instant section 2254 petition is untimely. However, the court must address whether the respondent waived the right to assert a statute of limitations defense, and/or whether the petitioner should be entitled to equitable tolling, in light of the court's error in advising the petitioner concerning the running of the statute of limitations.

### *Waiver of the statute of limitations defense*

A statute of limitations defense is not jurisdictional. Thus, a court has no obligation to raise it *sua sponte,* and a defendant or respondent may waive the defense if it is not raised at the proper time. *Day v. McDonough*, 547 U.S. 198, 205 (2006). As noted in *Day*, "[o]rdinarily in civil litigation, a statutory time limitation is forfeited if not raised in a defendant's answer or in an amendment thereto." 547 U.S. at 202 (citing Fed. R. Civ. P. 8(c), 12(b) and 15(a)). The *Day* Court further noted that it would be an abuse of discretion to override the deliberate waiver of a limitations defense. *Id.*

In *Robinson v. Johnson*, 313 F.3d 128 (3d Cir. 2002), the Third Circuit, sitting *en banc*, considered at what point in a habeas proceeding the limitations defense will be

---

[3]   The remaining 308 days under the statute of limitations actually expired on Saturday, January 14, 2012. However, because that date fell on a weekend, and the following Monday, January 16th was a federal holiday (Martin Luther King Day), the expiration date is considered to be the following Tuesday, January 17, 2012.

considered to have been waived.  That court held that "affirmative defenses under the AEDPA . . . if not pleaded in the answer . . . must be raised at the earliest practicable moment thereafter."  313 F.3d at 137.

In the instant case, the respondent had over two and a half months to gather the documents from the petitioner's prior proceedings before he filed his Motion for Summary Judgment.  The respondent should have been able to determine the relevant dates for calculating the statute of limitations from a review of those documents, or a simple telephone call to the Mingo County Circuit Clerk's Office and/or the Clerk of the SCAWV.  The respondent affirmatively stated in his Answer (ECF No. 14 at 1) that the petition appeared to be timely.  He further filed a Motion for Summary Judgment addressing the merits of all of the petitioner's grounds for habeas corpus relief, which did not address the issue of timeliness.  (ECF No. 15.)

Months later, after extensive briefing on the merits of the petitioner's claims, and further briefing concerning the petitioner's discovery motion, the respondent addressed, for the first time, the untimeliness of the petition, in a response brief concerning the petitioner's discovery motion.  Under these circumstances, it is difficult for this court to find that this was "the earliest practicable moment" that the respondent could have, with due diligence, raised this defense.  Accordingly, the undersigned proposes that the presiding District Judge **FIND** that the respondent has waived his right to assert a statute of limitations defense in this matter.

Because of the respondent's waiver of the statute of limitations defense, and because the petitioner's claims for habeas corpus relief lack merit, as will be more fully addressed *infra*, the undersigned finds it unnecessary to address any potential equitable tolling arguments that may be made.

**B.**     **The respondent's Motion for Summary Judgment.**

As noted in the Procedural History above, the petitioner's instant section 2254 petition raised eight grounds for relief.  Grounds Seven and Eight have since been withdrawn.  The undersigned will now address the merits of the remaining six grounds for relief, as addressed in the petition, the respondent's Motion for Summary Judgment, and the related briefs.

### *Factual background and relevant evidence*

The petitioner was arrested on March 12, 2004, after witnesses, Kenneth Toler, Luke Walls, and Leslie Lester, reported to authorities that they had seen the petitioner driving a white Chevrolet S-10 pick-up truck down Spice Creek Hollow Road in Mingo County, West Virginia, with an unidentified male in the bed of the truck, who appeared to be badly beaten and was gasping for breath and moaning.  (ECF No. 15, Ex. 11 at 168-185; 200-208.)  Toler, Walls and Leslie Lester were burning brush at Leslie Lester's cabin, and Toler's truck was blocking the road as the petitioner was trying to exit.  When Toler expressed concern about the man in the back of the petitioner's truck, the petitioner threatened to kill him if he moved any closer.  (*Id.* at 171-172, 184, 202.)

Law enforcement officials began to search for the petitioner, who was suspected to be driving under the influence.  The petitioner was located at his girlfriend's home in Horsepen, some 8-10 miles away from Spice Creek Hollow Road.  His white pick-up truck was also located there.  (*Id.* at 98.)  Sgt. J.B. Frye confronted the defendant about the allegations of Kenneth Toler and Luke Walls, and he denied the allegations.  However, the petitioner allegedly became verbally abusive and Sgt. Frye arrested him for obstructing an officer.  (*Id.* at 100.)  Sgt. Frye testified that he saw what appeared to be blood spatter on the petitioner's clothing, and in the bed of the pick-up truck.  Thus,

the clothing that the petitioner was wearing and the truck were photographed and collected as evidence.  (*Id.* at 99, 109-110.)

<u>The petitioner's statements to the police</u>

The petitioner was taken into police custody.  He subsequently gave four different statements about what had occurred that evening, implicating other people in the victim's murder and alleging that the victim died by means other than blunt force trauma to the head.  (*Id.* at 107-109, 111-113.)  After first stating that no one had been in his truck, the petitioner told Sgt. Frye that he and a guy, whom he did not know, had gotten into a fistfight up on Spice Creek Hollow Road.  The petitioner further asserted that he drove the man to the bottom of the road and dropped him off at the Verner Post Office.  (*Id.* at 100-101.)  After the petitioner had been taken to the Gilbert State Police Detachment, he initialed a written Miranda Rights form, and then gave the following written statement:

> I drove my truck to the top of Spice Creek Mountain to party and drink a little. When I pulled in Kenny Toler and Luke Walls was there with at least two more people.  It was just about starting to get dark.  I got out of my truck and was talking to a guy but I don't know who he was.  Kenny started arguing with another guy who was there.  An altercation broke out between Kenny and another guy.  I was starting to walk toward them with a beer in my hand.  Kenny grabbed a bat or a stick or something and hit the guy in the head at least five or seven times.  I said fuck this and I went to my truck.  I got in and sat down on the passenger's side.  Kenny opened my driver's side door and asked if I could drive him down the road.  I told him no I was drunk.  He said I could drive I'm not drinking.  I told him go ahead.  Kenny started driving and I was on the passenger's side.  The next think I remember Kenny hit the brakes kind of hard and woke me up.  I looked over to my right and seen the spillway bridge.  Kenny got out of the truck and I heard some thumping in the back of the truck.  I could see a car behind my truck.  The car's lights were on.  I think it was those other people that was at Spice Creek.  I got a cigarette and lit it.  I wasn't paying attention to what went on.  I scooted over to the driver's side, closed the door, put my truck in reverse and left and went straight to my girlfriend (Dana Jo Smith) house at Horsepen.  I was there forty five minutes to an hour and that's when you pulled in.  Q.  Did all of this you just told me

16

happen on March 12, 2004?  A. Yes.  Q. Do you know any one else who was at Spice Creek when this occurred?  A. Luke Walls was there but I didn't see him do anything.  Q.  Describe your truck.  A. A '96 S-10 2 wheel drive white.  Q.  Is that the truck that you had at your girlfriend's?  A. Yes.  Q. Was you advised of your Miranda Rights prior to giving this statement and did you understand them?  A. Yes.

I have had this statement read to me.  No promises or threats have been made to me and no pressure or coercion of any kind has been used against me in connection with giving this statement.

(ECF No. 15, Ex. 11 at 107-109.)[4]

That same night, sometime after the petitioner's clothing was collected, he gave a different written statement to a Sgt. White.  The statement to Sgt. White stated as follows:

Tonight I talked to the State Police about Kenny Toler killing a guy tonight at the spillway.  I talked to Sgt. White and Sgt. Frye and told them I was at Spice Creek tonight where I met Kenny Toler.  I was drinking at this time.  I met up with Kenny and he asked me to take him to Horsepen.  I told him I couldn't because I had been drinking.  Kenny and I had been dealing Oxycontin for about three and a half or four months.  I was doing it to make some fast cash.  Kenny told me he needed to go to Horsepen to talk to a guy that owed him for some Oxycontin.  Kenny wanted me to drive him but I told him I couldn't because I was drinking.  Kenny said I can drive, I'm not drinking, and I said let's go and I let him drive my truck, it's an S-10 Chevy.  We drove from Spice Creek to Horsepen.  When we were driving I was nodding in and out and I'm not sure where we went to at Horsepen.  We did go to Horsepen and we picked this guy up.  I don't know his name.  I'd never seen him before.  We weren't introduced and I never caught his name.  Kenny knew who he was and the guy got in the truck with me and Kenny.  I was sitting on the passenger side.  The guy got in on the driver's side and Kenny got in last and we started driving back toward Gilbert.  I heard them talking about pills and stuff.  At first Kenny was telling the guy that he was supposed to get Kenny his money.  Kenny said something like you were supposed to get the money to me on this day, you never had it.  It was that type of argument.  I never heard Kenny threaten him at that time.  The next thing I know we are at the spillway.  We went out to the parking area where the bridge is at.  I'm awake at this time.  We had got out of the truck.  When we first got out nothing much was said as I recall.  We had started across the bridge.  They had started

---

[4]  The record before this court does not contain the written statements themselves.  Thus, the text of the statements is taken from the trial transcript.

talking about drugs again at this time.  I think they were still talking about drugs again at this time.  I think they were still talking about some money that the guy owed Kenny that he never paid.  We were still walking at that time.  We walked across the bridge and started toward the face of the damn [sic; dam], things really started getting physical between Kenny and the guy.  I don't know who hit who first but I seen Kenny hit the guy.  We kept going but Kenny and the guy kept fighting and arguing.  At that time we were walking back toward the truck.  The guy was throwing his hands up like he was protecting himself.  It seemed to me like the guy was trying to walk back toward the truck.  We got about halfway down through there.  It really really got heated at this time.  The guy walked faster and faster away from Kenny.  It had slowed up just a little bit between the two but there was still arguing going on.  At that time Kenny picked a rock up and hit the guy numerous times with the rock in the head.  It knocked the guy down, but he was able to get back up.  While the guy was down, Kenny was hitting with the rock wham, wham, wham.  The guy had got up and started to run away.  Kenny had slowed up from running after him.  We started up this concrete and we got up toward the truck.  I know of one time that Kenny hit him and he fell down and he didn't get back up.  The guy didn't get back up.  Kenny said come on, help me get him in the truck.  I told Kenny that I'm not in on this.  He said you're just as in on it as I am, now come on and help me get him onto the truck.  I helped Kenny pick the guy up and put him in the truck.  I don't know if the guy was still alive or not at that time.  We put him in the bed of the truck.  We drive to Jack's Hole.  Kenny drove.  We drive there and Kenny was talking about taking him out there and dropping him off.  I was panicking, he was panicking.  We drove back out to the spillway.  Okay.  Then he got out and got him over his shoulder.  Kenny took him back down to where he had beat him and threw him in the water.  I didn't help Kenny get him out of the truck.  I slid over to the driver's side.  Kenny came back to the truck.  I assumed he threw him in the water.  Actually, I seen him throw him in the water.  We got back in the truck.  I drove back to Gilbert.  When we got back to Gilbert I dropped Kenny off at the intersection.  We didn't say nothing to each other on the way back to Gilbert.  I told Kenny I had to go see Dana and that's where I went.  A little while later Frye came and picked me up and I came here.  That's exactly how it happened.  I didn't tell the truth the first time because I was scared.  I was scared of conspiracy.  Hell, I was right there.  I didn't know that Kenny was going to kill him.  It never crossed my mind that he was going to kill him and that's the truth.

(*Id.* at 156-159.)

According to Sgt. Frye's testimony, sometime after the third statement was given, the petitioner told them that "Christopher Paul Cook had taken $50.00 to beat up a

subject that he didn't know, and brung him to him at Justice, I believe it was, where Chris Cook shot him in the head and them they dumped him in the river." (*Id.* at 111.)

On April 1, 2004, the body of William Bert Davis was found nearby in the Guyandotte River, about two miles down from the R.D. Bailey Dam spillway. (*Id.* at 113.) The cause of Mr. Davis's death was determined to be blunt force trauma. He did not suffer any gunshot wounds. (*Id.* at 112.) Subsequent testing by the West Virginia State Police Crime Lab revealed that blood consistent with Mr. Davis's DNA was found on samples from the petitioner's pants and shoes, and in the bed of the pick-up truck. (ECF No. 15, Ex. 12 at 79.)

<u>*The petitioner's defense*</u>

At trial, the petitioner's trial counsel, John R. Mitchell, Sr., mounted a defense based upon the theory that, although the petitioner had admitted to striking Mr. Davis that day, causing his nose and lip to bleed, and possibly resulting in some of Mr. Davis's blood being found on the petitioner's clothing, the beating that resulted in Mr. Davis's death would have caused a much more significant amount of blood splatter than that which was found on the petitioner's clothes. The petitioner testified at trial, stating that he and Mr. Davis had been drinking up on Spice Creek Mountain and got into a fistfight because he caught Mr. Davis trying to take some of his prescription medication. He further stated that he punched Mr. Davis three or four times, causing his nose and lip to bleed. He denied causing any more significant injuries to Mr. Davis. (ECF No. 15, Ex. 12 at 130-133. 139.)

The petitioner further testified that they continued to drink for a little while and then he drove Mr. Davis down the mountain, asking him to ride in the back of the truck so he wouldn't get blood on anything in the cab. (*Id.* at 133-134.) The defendant stated

that he saw Kenny Toler as they came down the road, but he did not stop to talk.  The petitioner testified that he drove Mr. Davis to Justice and dropped him off at a store there.  The petitioner stated that he went into the store, and when he came back out he saw Chris Cook walking towards Mr. Davis.  The petitioner testified that he left the store and went to his girlfriend's house in Horsepen.  He further stated that, on his way there, he saw an ex-girlfriend, Tina Cline, and spoke with her for a few minutes.  (*Id.* at 137-138.)  Ms. Cline also testified that she talked to the petitioner for about 15 or 20 minutes around 6:00 p.m. that night.  (*Id.* at 167-169.)  The petitioner attempted to explain that he lied and gave the various statements about what happened that night because he was scared, and because he was under the influence of alcohol and drugs.  (*Id.* at 140-143.)

Although Mr. Mitchell vigorously cross-examined the State's witnesses concerning the blood evidence, he did not pursue independent DNA testing or retain an expert witness to attempt to rebut the State's evidence.  The defense also attempted to establish that Mr. Davis was actually seen alive by other witnesses subsequent to March 12, 2004, after the petitioner was in police custody.  (*Id.* at 185-185-188, 192-196.)

### *The petitioner's prior murder conviction*

In April of 1997, the petitioner pled guilty to a charge of second–degree murder resulting from the beating death of Owen Harvey.  The petitioner was released from prison in July of 2003, and the murder of William Bert Davis occurred approximately eight months later.  At a February 7, 2005 suppression hearing, the prosecutor informed the trial court that it had no intention of introducing evidence of this prior conviction unless the defense opened the door to do so.  (ECF No. 15, Ex. 9 at 4-6.)  However, on February 16, 2005, the State filed a Notice of Intent to Introduce 404(b) Evidence.  On

the first day of trial, prior to *voir dire*, the defendant asked the court to take up the State's Rule 404(b) motion and the defense's related motion *in limine*.

The State argued that the manner in which the crime was committed – blunt force to the head and chest– and the circumstances surrounding both offenses, were "strikingly similar." (ECF No. 15, Ex. 11 at 11.)  Furthermore, the cause of death was the same in both cases.  (*Id.* at 9-11; ECF No. 15, Ex. 12 at 143.)  The State further asserted that Earl Stewart, an inmate who served time with the petitioner at the Denmar Correctional Center, stated that he overheard the petitioner say that if he killed again, he would throw the body in the river to make it more difficult to ascertain the manner of death.  This statement was obviously made prior to the death of William Bert Davis. (ECF No. 15, Ex. 11 at 10.)  The State argued that the evidence of the prior murder placed the proffered Stewart testimony into its proper context and was relevant to his credibility.  The State further asserted that it explained why the victim's body was found in the river.  (ECF No. 19 at 22.)

The trial court published an order (which is not in the record before this court) ruling that the evidence was admissible under Rule 404(b).  (ECF No. 15, Ex. 11 at 65.) The court directed defense counsel to submit a proposed limiting instruction.  (*Id.*) According to the respondent's Memorandum of Law in support of his Motion for Summary Judgment, the trial court ruled that the State had articulated sufficient reasons to admit the evidence of the petitioner's prior murder conviction and that, in light of Mr. Stewart's testimony, it was intrinsic evidence or *res gestae*.  On that basis, the court found that the evidence was not subject to the restrictions of Rule 404(b). (ECF No. 19 at 22-23.)

The trial court allowed the parties to mention the prior crime in opening statements. The State's opening addressed the prior crime as follows:

> Finally, this is the defendant's second murder. He was convicted in April of 1997 of second degree murder by a guilty plea. He's 30 years old. He's murdered twice, but the facts in the case are strikingly similar. Both manners of death was homicide. Both victims died of multiple blunt force injuries, both for no apparent reason other than just generally a design to just beat someone and, in both, he had drunk mild quantities of alcohol prior to both killings. Strikingly similar circumstances.

(ECF No. 15, Ex. 11 at 86-87.) The State's opening also addressed the potential testimony of Earl Stewart, as follows:

> Earl Stewart, he may testify. He's an inmate now at the Denmar Correctional Facility. He was housed with the defendant for a while. He will tell you, we believe, that he heard the defendant say if you ever murder someone the best thing to do with the body is to throw it in the river, and explained why, that the body would catch on rocks and so on and so forth, and the victim's body was found in the Guyandotte River.

(*Id.* at 86.)

In the defendant's opening statement, his counsel told the jury that the two incidents were "unrelated in all respects," and that the State was attempting to introduce evidence of the petitioner's prior murder conviction because it had no reliable evidence linking the petitioner to the murder of William Bert Davis. (ECF No. 15, Ex. 11 at 91.) He urged the jury not to convict his client based upon something that occurred 10 years before. (*Id.*)

The State subsequently admitted a certified copy of the petitioner's guilty plea order. (*Id.* at 115.) Dr. Kaplan, the medical examiner who performed the autopsy on William Bert Davis and testified about the condition of his body and probable manner of death, further testified that Owen Harvey had also died from multiple blunt force trauma, and that both victims were killed by multiple blows to the head and chest. (ECF

No. 15, Ex. 12 at 24.)  After the doctor's testimony, the jury was instructed that it could only consider Dr. Kaplan's testimony as evidence of motive, opportunity, identity, intent, *modus operandi*, and the absence of mistake or accident.  (*Id.* at 28-29.)

Mr. Stewart testified that, while he was incarcerated with the petitioner at Denmar, he overheard the petitioner say that, if he murdered someone, he would dump the victim's body in the river because the rocks would beat them so badly that authorities would be unable to determine the cause of death.  (*Id.* at 187, 189.)  Mr. Stewart further testified that the petitioner had admitted to murdering Owen Harvey and seemed somewhat proud of it.  (*Id.* at 196.)  Mr. Stewart also testified that the petitioner threatened to disfigure or mutilate anyone who ever "told on him" or "does me wrong."  (*Id.* at 187.)  As Mr. Stewart left the witness stand, he told the jury "if you let him go he will murder again."  (*Id.* at 197.)  The trial court sustained the defense's objection, and instructed the jury to disregard that comment.  (*Id.*)

Additional trial testimony from Sgt. J.B. Frye, one of the investigating officers, indicated that, when Sgt. Frye went in search of the petitioner on the night of this alleged incident, the petitioner's father, Frank Lester, remarked, "Oh, I hope he hasn't done it again." (ECF No. 15, Ex. 11 at 97.)  Frank Lester denied making that statement when he testified in his son's case in chief.  (ECF No. 15, Ex. 12 at 112-113.)  Frank Lester did acknowledge, however, that his son had previously beaten Owen Harvey to death. (*Id.* at 113.)

On cross-examination, the petitioner was asked extensively about the circumstances of the Owen Harvey murder.  (ECF No. 15, Ex. 12 at 143-146.)  On March 12, 2004, when he was questioned by police, the petitioner told the officers that Mr.

Davis had been beaten to death with a bat and a rock.  At trial, the prosecutor asked the petitioner how he knew that since Mr. Davis's body was not found until April 1, 2004.

The prosecutor also referenced the petitioner's prior crime in his closing argument, stating:

> Look at the hauntingly striking similarities between Owen Harvey's death  and William Davis's death.  They were both beaten to death.  Both sustained massive chest injuries, and you'll be able to look at the autopsy reports.  Both sustained massive head injuries and in both cases for, seemingly no reason at all, they were beaten to death.  You heard the defendant yesterday what he told the police after the Owen Harvey death.  There's certainly nothing in this case that would indicate there was a reason to murder William Davis.  For some reason, he just got ticked off and lost his cool, became enraged, and just, for no reason at all, a cold blooded murder.

> I'm not sure about Owen Harvey's size, but William Davis was five six, a hundred and twenty pounds.  You can look at his autopsy report.  The defendant is a burly six one, two hundred five, two ten.  I would almost guess Owen Harvey was little, small guy too.

> Premeditation and deliberation – that's what we think of the main – of first degree murder, and the State gave you evidence that would indicate that the defendant murdered William Davis with premeditation and deliberation.   Think about this; First of all, you heard that the defendant had experience murdering people.  He's 30 years old.  This is his second murder prior to age 30.  He knew what it took to beat someone to death.  He beat Owen Harvey to death.

> * * *

> Two murders by the defendant before the age of 30.  He boasted about doing only seven or eight years.  No remorse, no mercy.

(ECF No. 15, Ex. 13 at 9-10, 13.)

In response, the petitioner's counsel, Mr. Mitchell, again emphasized the State's lack of direct evidence concerning the murder of William Bert Davis, and again contended that the State was relying on the petitioner's prior murder conviction to

convict him of the Davis murder.  (ECF No. 15, Ex. 13 at 15, 20.)  Mr. Mitchell further

argued:

> Now, in order to believe the State's version of what happened, you're going to have to believe my client not only became enraged on one occasion but on two separate occasions, because, you remember, the medical examiner said those blows to the head would have killed him or knocked him unconscious instantly or within a very, very short time and there's going to be a massive amount of blood.  I want you to look at those pictures of what my client was wearing.  We know he was wearing those clothes, and see if you see any massive amount of blood on him.  If you look at the pictures you can't see a single spot.  These spots, the officer has testified, they tested for DNA on those spots.  If he didn't have some blood on him I would be suspicious, because then he would have gone back and changed his trousers or changed his clothes and tried to hide what he had done, if he had done it.

> The State has proven there was somebody in the back of the truck. The only tie to my client and this unfortunate fellow that got beat up was the blood on his trousers, little spots of blood on his trousers.  Please don't pay much attention to the holes in his trousers over there because they're cut out, massive amounts of material, but you look at the pictures, look on the pictures. * * *

(*Id.* at 15-16.)  Mr. Mitchell emphasized that the two witnesses who testified that they

saw Mr. Davis alive after the petitioner had been arrested did not have any connection

to the petitioner and had no reason to lie for him.  (*Id.* at 18-19, 22.)  Mr. Mitchell

asserted that the petitioner was the victim of circumstance and overzealous law

enforcement who concluded that he had murdered the victim three weeks before his

body was found.  (*Id.* at 16-22.)

In rebuttal, the prosecutor pointed out that the witnesses who said they saw Mr.

Davis alive after March 12, 2004 never reported that to the police or the prosecutor

prior to testifying at the trial.  (*Id.* at 24.)  He also focused on the fact that the

petitioner's prior statements, inconsistent though they were, all confirmed that Mr.

Davis died on March 12, 2004.  (*Id.*)  He again addressed the petitioner's prior murder

conviction and the similarities in the nature of the crime and the injuries that lead to the deaths.  Finally, the prosecutor emphasized that the petitioner received leniency after the first murder and asked the jury not to let that happen again.  (*Id.* at 25.)

The trial court repeated its cautionary instructions concerning the prior crime evidence at the close of the State's cross-examination of the petitioner and again during the charge to the jury.  (*Id.* at 158-160, 226.)  Thus, the jury was told at least three different times of the limitations placed on their consideration of the prior crime evidence.

### ***Standard of Review***

Title 28 U.S.C. § 2254(d), which was adopted as part of the Anti-terrorism and Effective Death Penalty Act of 1996 (the "AEDPA") provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

In *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000), the Supreme Court held that under the "contrary to" clause, a federal court may grant a writ of habeas corpus with respect to claims adjudicated on the merits in state court only if (1) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or (2) if the state court decides a case differently from the Supreme Court on a set of

materially indistinguishable facts. The Court further held that under the "unreasonable application" test, a federal court may grant a writ of habeas corpus with respect to a claim adjudicated on the merits in state court only if the state court identifies the correct governing principle from the Supreme Court's decision, but unreasonably applies that principle to the facts of the prisoner's case. *Id.* at 413.

Moreover, the AEDPA contains a presumption that a state court's factual findings are correct:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1).

Rule 56 of the Federal Rules of Civil Procedure applies to habeas corpus proceedings. *See*, *e.g.*, *Blackledge v. Allison*, 431 U.S. 63, 81 (1977); *Maynard v. Dixon*, 943 F.2d 407, 412 (4th Cir. 1991). Entry of summary judgment is appropriate when there is "'no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Rule 56(c), Fed. R. Civ. P.).

<u>Analysis</u>

### A.      Grounds One through Four – Rule 404(b) evidence.

In Grounds One, Two, Three and Four of his section 2254 petition, the petitioner asserts that the admission at his trial of evidence concerning his prior murder conviction violated his due process rights. In Ground One, the petitioner contends that his rights to a fair and impartial jury trial were violated when the trial court failed to require the State to identify and plausibly articulate how the prior crime evidence was relevant to

issues in his murder trial.  (ECF No. 2 at 7-10.)  In Ground Two, the petitioner further asserts that the State's rationale for admission of the evidence under Rule 404(b) was "vague and conclusory."  (*Id.* at 12-14.)  In Ground Three, the petitioner contends that his due process rights were violated by the admission of the testimony of Earl Stewart. (*Id.* at 16-17.)  And, finally, in Ground Four, the petitioner asserts that he was prejudiced by an insufficient limiting instruction concerning the Rule 404(b) evidence.

According to his section 2254 petition, on January 7, 2005, the Petitioner, by his trial counsel, filed a Motion in Limine to prohibit the state from referring to his prior second-degree murder conviction, stating that such evidence would be substantially outweighed by the danger of unfair prejudice.  On February 16, 2005, the state filed a Notice of Intent to Introduce 404(b) Evidence, for the purpose of "proof of motive, intent, identity and absence of mistake or accident."  (*Id.* at 7.)  In support of the admission of the prior conviction under Rule 404(b), the State further asserted as follows:

> The evidence tends to show premeditation and deliberation.  The mode of operation is strikingly similar.  Both victims received multiple blunt force injuries.  The manner of death in both cases was homicide.  The Defendant consumed mild quantities of alcohol prior to both homicides.  The evidence will corroborate Earl S. Stewart's testimony.

(*Id.*)  The petitioner responded to the Notice asserting that use of his prior crime evidence to show that he acted in conformity therewith was prohibited, and that the State had merely cited a "laundry list" of possible uses under Rule 404(b) which was insufficient to establish the legal relevance of the evidence.  (*Id.*)

Citing to the trial transcript, the petitioner's petition further states that, on the morning that his trial began, the court conducted an *in camera* hearing on the proposed Rule 4040(b) evidence.  The State again asserted that it was offering the evidence to

show identity of the perpetrator, intent, mode of operation, and absence of mistake or accident.  (*Id.* at 8.)

The trial court denied the petitioner's motion *in limine* and allowed the State to introduce evidence of the petitioner's prior murder conviction at trial.  According to the petition:

> First the court ruled that the state had provided an adequate articulation of the purpose of offering the 404(b) evidence.  Second, the court held that the 404(b) evidence was necessary to "complete the story" and explore the circumstances and context of the proposed testimony of Earl Stewart. Accordingly the trial court found the proffered 404(b) evidence relevant for proof of motive, opportunity, intent, identity, *modus operandi*, and absence of mistake or accident, and such evidence was not unfairly prejudicial with a proper limiting instruction.

(*Id.*)

The petitioner asserts, however, that State failed to establish a "clear and cogent" ground for the admission of the prior murder conviction, as required by law, and that Earl Stewart's testimony did not correlate with the State's pre-trial representations that it would serve as a basis for admission of the Rule 404(b) evidence.  Citing *State v. McGinnis*, 455 S.E.2d 516 (W. Va. 1994), the seminal West Virginia case on admission of evidence under Rule 404(b), the petitioner contends that the prosecution must identify the specific purpose for which the evidence is offered, and the jury must be instructed to limit its consideration of that evidence to only that purpose, and not all possible purposes.  The petitioner then cites the SCAWV's more recent decision in *State ex rel. Canton v. Sanders*, 601 S.E.2d 75 (2004), which held:

> To satisfy the requirement to clearly show the specific and precise purpose for which evidence is offered under West Virginia Rule of Evidence 404(b), as set out in Syllabus Point 1 of *State v. McGinnis* 193 W. Va. 147, 455 S.E.2d 516 (1994), the proponent of the 404(b) evidence must not only identify the fact or issue to which the evidence is relevant, but must also plainly articulate how the 404(b) evidence is probative of that

fact or issue.  If the 404(b) evidence is determined to be admissible, then a limiting instruction shall be given at the time the evidence is offered , and must be repeated in the trial court's general charge to the jury at the conclusion of the evidence.

(ECF No. 2 at 9.)  The petition further contends:

Implicit in the [SCAWV's] holding is the requirement that the proponent establish the legal relevance of the 404(b) evidence in a plain, clear and unforced manner.  But in the petitioner's case, a fair reading of the trial record reflects that the trial court failed to insist that the State explain clearly and concisely how the petitioner's conviction for second-degree murder of Owen "Ironhead" Harvey, and the fact of that prior crime, were relevant to the present case or probative to the stated issues before the trial court.  But, in Mr. Lester's case, it appears that the evidence had no probative value whatsoever, and thus should have been excluded.  Thus, in the context of his case, where it is a close issue on circumstantial evidence, the prejudice is severe and mandates a finding of denial of due process.

(*Id.*)

In Ground Two, the petitioner elaborates on his contention that the rationale given by the State for admission of his prior murder conviction was not "clear and cogent."  He asserts that the alleged beating deaths of Owen Harvey and William Bert Davis were distant in time, and were dissimilar in mode of operation and circumstances. (*Id.* at 12.)  The petitioner further contends that just a general similarity between the crimes is insufficient to justify admission of evidence under Rule 404(b).  The petitioner further contends that, for admission of evidence to establish *modus operandi*, the State must make a showing of substantial similarity and uniqueness to establish the proffered evidence's probative value versus the prejudicial effect.  The petitioner asserts that the only commonality of the circumstances of these two cases was the supposed manner of death involving "blunt force injury," which the petitioner asserts to be insufficient to establish *modus operandi.*  (*Id.* at 12-13.)

30

The petitioner also asserts that the State failed to establish how his prior crime evidence was logically probative of motive or intent. He further asserts that the State never established a motive for the murder of Owen Harvey, to which the petitioner confessed, and that the prosecutor in the instant case admitted in his final summation that the State could not show a motive for the murder of Mr. Davis. (*Id.* at 14.) Likewise, the petitioner asserts that he did not assert a defense of accident of mistake, such as a failure to appreciate the extent of Mr. Davis's injuries from their earlier fight. Thus, the State had no basis to admit the prior crime evidence to rebut such a defense. (*Id.* at 14.) The petitioner further contends:

> As a further demonstration the Petitioner argues the petit jurors misunderstood the necessity of a genuine logical relationship between the issue and the proposed prior bad acts evidence that did not have any similarities to the case before them, and even though the prosecuting attorney argued at the pretrial hearing that the Petitioner had killed Mr. Harvey in 1995 before. See (T. Tr. Vol. I, pg. 9). The state turned around in final summation and acquiesced to no motive- intent, but the trial judge rejected the Petitioner's defense arguments, and the jurors were not cautioned regarding the premeditation and deliberation without motive. This adverse ruling further violated the Petitioner's rights to a fair trial free from prejudice which is a violation of his guaranteed rights to Due Process of Law under the Fourteenth Amendment of the United States Constitution.

(*Id.*)

Turning to the admission of the testimony of Earl Stewart, the petitioner contends that, at the *in camera* hearing, the prosecutor asserted that Mr. Stewart, with whom the petitioner had been incarcerated at the Denmar Correctional Center, after the petitioner was convicted of the Owen Harvey murder, would testify that the petitioner had stated to Mr. Stewart, "When I kill again, I'll put the body in the river," or "if I ever kill again, I'll put it in the river." (T. Tr. Vol. I, pg. 10). The petitioner further asserts, however, that Mr. Stewart's actual testimony was "considerably less specific." (ECF No.

2 at 16.)  In fact, Mr. Stewart testified that the petitioner told him:  "If someone would put somebody in a river up here, by the time he washed through the rocks, you couldn't tell what happened to him."  (T. Tr. Vol. I, pg 187).  At a later point in his testimony, Mr. Stewart stated that the petitioner said, "If you dump somebody up here, by the time they float down to the other part of the shallow river the rocks would beat them to death and they would never know what happened to him."  (T. Tr. Vol. I, pg. 189).

The petitioner contends that these statements were allegedly made while he and Mr. Stewart were incarcerated at the Denmar Correctional Center, near the Greenbrier River, and far away and remote in time to the death of Mr. Davis.  Thus the petitioner claims that this testimony is not relevant to the issues involved in the Davis case, nor is it sufficient to serve as a basis for the admission of the petitioner's prior conviction.  (*Id.* at 16-17.)

Finally, concerning the limiting instruction given to the jury concerning the Rule 404(b) evidence, the petitioner asserts that, "because the trial court had failed to limit the issues related to the 404(b) evidence, and had failed to reject the state's aggressive, but unpersuasive attempts to provide a logical link between the evidence and the issues, the trial court's limiting jury instructions became a mere list of possible issues."  (*Id.* at 19.)  The petitioner further contends:

> Wherefore, the Petitioner maintains that it is more than the law can or should require of twelve (12) ordinary citizens to ask that they put the horrifying images of Owen Harvey's death out of mind, to set thoughts of character and propensity aside, and sort through the legitimate uses of the 404(b) evidence as instructed by the trial court.  Thus, your Petitioner submits that under the circumstances of his trial, the court's limiting instructions were clearly insufficient as a matter of state and federal law to cure the unfair prejudice created by the evidence of his prior bad act crime of the murder of Mr. Harvey [nine] (9) years previously to the death of Mr. Davis.

(*Id.* at 20.)   The petitioner asserts that the rationale for the admission of the evidence was not clearly explained, that the potential prejudice was not properly balanced and that the curative instruction was not effective, resulting in an unfair trial.  (*Id.*)

The respondent collectively addresses these four grounds for relief in his Motion for Summary Judgment.  As correctly noted by the respondent, this federal court is not concerned with whether the evidence of his prior crime was properly admitted under state evidentiary law.  Rather, this court must address the sole issue of whether the introduction of this evidence so infected the petitioner's trial that it resulted in a fundamentally unfair trial, in violation of the petitioner's due process rights under the Fourteenth Amendment.  (ECF No. 19 at 17.)  The respondent's Memorandum of Law further states:

> When an evidentiary ruling is so egregious that it results in a denial of fundamental fairness, it may also violate the federal constitutional guarantee to due process and thus warrant federal habeas relief.  *Estelle v. McGuire*, 502 U.S. 62, 72-73 (1991).  These cases are exceptionally rare, and the Petitioner's burden of proof is onerous.  Proving a mere violation of state law is not enough.  "Generally, state-court evidentiary rulings cannot rise to the level of due process violations unless they offend [] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental."  *Montana v. Egelhoff*, 518 U.S. 37, 43 (1996).  *See also Lisenba v. California*, 314 U.S. 219, 236 (1941)(to prove due process violation in state criminal trial based upon discretionary evidentiary rulings petitioner must prove that trial court failed to observe that fundamental fairness essential to concept of ordered justice and that absence of that fairness fatally infected petitioner's trial).

(*Id.* at 17-18.)

The respondent's Memorandum further asserts that the petitioner has not argued that the admission of the evidence of his prior murder conviction violated his fundamental right to due process, but instead "dwells on the state law ramifications of the trial court's decision."  (*Id.* at 21.)  The Memorandum further argues:

The evidence in question was admissible as evidence of intent and identity under state law.  It also corroborated another witness['s] testimony and constituted *res gestae* of the offense.  The trial court, the state habeas court and the [SCAWV] properly rejected the Petitioner's claim that the evidence was unfairly prejudicial.  His decision to focus on state law renders his federal ground to relief a nullity.  Although he makes passing references to "due process" and his right to a "fair trial" the Petitioner fails to connect the admission of this evidence with these fundamental constitutional concepts.  "Exhaustion demands more than a drive-by citation detached from any articulation of an underlying federal legal theory." *Castillo v. McFadden*, 399 F.3d 993, 1003 (9th Cir. 2005).

Even if this court were to relieve the Petitioner of his burden of proof and address this issue *sua sponte*, there [sic; the] record does not suggest that the trial court's decision so infected Petitioner's trial as to deny fundamental constitutional rights rooted in the concepts of "ordered liberty." [*Rochin v. California*, 342 U.S. 165, 169 (1952)].  Even if the trial court had excluded the evidence, the outcome would have been the same.  The State's evidence of guilt was overwhelming.  Nor has the Petitioner proven that this evidence had a "substantial and injurious effect or influence in determining the jury's verdict."  *Brecht*, 507 U.S. at 638.  Indeed, defense counsel's argument that the jury could find reasonable doubt from the admission of this evidence was particularly effective.

(*Id.*)

The respondent's Memorandum of Law addresses in detail the testimony given and arguments made about the prior crime evidence, as well as Mr. Stewart's testimony, as discussed above in the factual background and summary of relevant evidence.  (*Id.* at 22-28.)  The respondent then asserts:

Despite Petitioner's arguments to the contrary, the State did not rely upon a series of generic, unconnected factors to justify admission of the evidence of the prior murder.  Instead, it compared the totality of the circumstances surrounding both crimes and proved that they were almost identical.  The Petitioner has a habit of losing his temper and crushing his victims' skulls with a blunt instrument.  The evidence suggested that the Petitioner is a physically large and imposing man.  Mr. Stewart testified that he was a physical man.  (Resp't Ex. 11 at 187.)  The similarity of these acts, when considered in tandem, and the consequences surrounding them were substantive evidence of the Petitioner's mode of operation.  (Resp't Ex. 11 at 11.)

> More importantly, the evidence corroborated Earl Stewart's testimony [footnote omitted]. The Petitioner did not seem to appreciate the probative value of this evidence within the context of Mr. Stewart's testimony [footnote omitted]. Both the Petitioner and Mr. Stewart were inmates at the same prison. Mr. Stewart overheard the Petitioner say that he had murdered before, and if he murdered again he would dump the body in the river. The statement's probative nature is not based upon the fact that the Petitioner had murdered before; it is the fact that Mr. Stewart, someone who had no independent source for this information, knew about it. It makes it more likely that the Petitioner made the statement. Mr. Stewart knew two facts about the Petitioner that he had no business knowing. Each part of Mr. Stewart's testimony bolstered the other. The Petitioner did have a prior murder conviction, and had dumped the body of his second victim in the river - - exactly where the investigating officers found it [footnote omitted].

(ECF No. 19 at 28-29.) The respondent's Memorandum of Law further asserts that the prior crime evidence and Mr. Stewart's testimony were probative of the issues of *modus operandi* and identity of the assailant. (*Id.* at 29-31.)

The respondent's Memorandum of law further asserts that the prior crime evidence was not prejudicial to the petitioner because the evidence of his guilt was overwhelming and, that, even without evidence of the prior murder, the jury would have found the petitioner guilty beyond a reasonable doubt. (*Id.* at 31-33.) In particular, the respondent contends that the testimony of the witnesses who saw the victim bleeding and gasping for breath in the back of the petitioner's truck, the blood evidence found on the petitioner's clothes and truck, the location of the victim's possessions up on Spice Creek Mountain, and the petitioner's four vastly different accounts of what occurred that night were sufficient evidence of his guilt, notwithstanding the prior crime evidence. (*Id.*)

The petitioner's Response in Opposition to the Motion for Summary Judgment asserts that the prior murder was a prominent issue in the prosecutor's cross-

examination of the petitioner and his closing argument.  (ECF No. 30 at 15-16.)  The

petitioner's Response further states:

> When considered in the light of this aggressive use of the earlier
> murder to prove the one for which he was on trial, the limiting instructions
> were woefully inadequate to limit the jury's use of this evidence to its
> proper purpose.  This evidence may have been introduced to show that Mr.
> Lester knew that he was physically capable of beating a person to death.
> Though it was disputed, the prosecution argued that the two offenses were
> sufficiently similar to imply they were committed by the same person –
> modus operandi.  In its general charge to the jury, given before closing
> arguments, the Court instructed:
>
>> "You have heard evidence concerning alleged conduct or
>> other acts of the Defendant that are not charged in this
>> indictment.  You are instructed that such evidence is not
>> admitted as proof of the Defendant's guilt on the present
>> charge.  This evidence is admitted for a limited purpose only,
>> and it may be considered by you only in deciding whether a
>> given issue or element relevant to the present charge is
>> proven.  This evidence may only be considered for the
>> purpose of determining whether the State has established
>> the following: proof of motive, opportunity, intent, identity,
>> modus operandi, or absence of mistake or accident.  T. Tr.
>> Vol. II, p. 226.
>
> This instruction told the jury they could consider the evidence of the prior
> murder on issues to which it was clearly irrelevant:  motive, opportunity
> and intent.  Such an instruction could only serve to confuse a jury, which is
> already asked not to consider the evidence "as proof of the Defendant's
> guilt on the present charge."  The aggressive use of the evidence of the
> prior murder, when coupled with vague and misleading limiting
> instructions, created the real possibility that the jury would punish Lester
> based on the perceived inadequate sentence he got on the first murder
> rather than on a finding he committed the one for which he is charged.

(*Id.* at 16-17.)

The petitioner cites the Supreme Court's decision in *Romano v. Oklahoma*, 512

U.S. 1 (1994), in which the Court upheld the admission of a prior conviction and death

sentence at the penalty phase of a later murder prosecution.  As noted by the petitioner,

in determining whether the introduction of such evidence violated the defendant's due

process rights, the Court applied the framework of *Donnelly v. DeChristoforo*, 416 U.S.

637, 643 (1974).  The petitioner's Response addresses the *Romano* decision as follows:

> The question is whether the introduction of the prior conviction and sentence so infected the sentencing proceeding with unfairness as to deny due process.  [512 U.S. at 12]  The Court gave two reasons as to why it did not.  First, presuming that the jury followed the limiting instructions, the evidence had no effect.  Second, even if the jury did give this evidence weight, it was not clear which way it would cut.  A juror might vote for a death verdict because of the prior murder and the fact that the defendant was going to be executed anyway.  The juror might vote for life because there was no need to kill Romano twice.  [*Id.* at 13-14.]

(ECF No. 30 at 17.)  The two other cases cited by the petitioner in his Response on this

issue concerned the alleged prejudice of improper closing arguments by the prosecutor.

In *Donnelly v. Chirstoforo*, *supra*, the jury was made aware that the defendant's co-

defendant had pled guilty to a lesser charge of second degree murder, and the

prosecutor argued that he believed the defendant wanted the jury to find him guilty of a

lesser charge as well, if he were not acquitted.  The trial court gave a limiting instruction,

and the Supreme Court found that DeChristoforo's trial was not fundamentally unfair.

Similarly in *Darden v. Wainwright*, 477 U.S. 168 (1986), the Court found that the

allegedly improper remarks by the prosecutor were invited by comments made by

defense counsel, and that the remarks were not fundamentally unfair under all the

circumstances.  *Id.* at 181-182.  (ECF No. 30 at 17-18.)

The petitioner contends, that in his case, there were no effective limiting

instructions and that his counsel provided no effective rebuttal to the prosecutor's overly

aggressive use of the facts of the prior conviction.  He contends that the use of the prior

murder conviction had a substantial and injurious effect in the jury's determination of

its verdict.  (*Id.* at 18.)

The respondent's Reply reiterates his contention that this is solely a matter of state law. Citing a case from North Carolina, *State v. Hipps*, 501 S.E.2d 628 (N.C. 1998), in which the prosecution was able to admit evidence of the defendant's prior murder conviction from 17 years prior to his current trial, the respondent further asserts that Rule 404(b) is "a rule of inclusion requiring exclusion for only one reason: if the evidence is introduced solely on the issue of the defendant's bad character." (ECF No. 40 at 2.) The respondent's Reply further argues:

> During his opening, counsel for the State told the jury that the Petitioner had murdered before. He also said that both victims died of multiple blunt force injuries, the Petitioner murdered both without provocation, and the Petitioner consumed alcohol before killing both victims. (Resp't Ex. 11 at 86-87.) During his summation, counsel for the State once again argued that both murders were "strikingly similar." (Resp't Ex. 12 at 9.) He emphasized that both murders were conducted in the same manner, that both victims sustained massive chest injuries, and that there was no evidence of provocation. The Petitioner knew that repeated blows to the head with a blunt object would eventually cause the victim's death because he had done the same thing before.
>
> The Petitioner's characterization of the State's use of this evidence as needlessly "aggressive" is wholly without merit. The Petitioner had committed a murder in 1995 for which he was incarcerated until 2004. Shortly after his release from the penitentiary he committed yet another murder in a strikingly similar manner. The evidence proved motive, or lack thereof, the Petitioner's mode of operation which included alcohol ingestion followed by intentional severe beating causing massive head trauma leading to death. The trial court then delivered a lengthy curative instruction specifically telling the jury that they were prohibited from considering this evidence as evidence of Petitioner's guilt. Given the trial court's broad discretion on this issue, it cannot be said that the admission of this evidence violated state law, let alone federal constitutional law. Syl. pt. 1, *State v. Pettrey*, 549 S.E.2d 323 (W. Va. 2001) ("Rulings on the admissibility of evidence are largely within the trial court's sound discretion and should not be distributed [sic ; disturbed] unless there has been an abuse of discretion.")

(*Id.* at 2-3.)

The respondent's Reply further asserts that the petitioner then tries to shift the focus of this claim from a potential violation of Rule 404(b) to a claim of prosecutorial misconduct concerning the State's opening and closing arguments, which, the petitioner claimed, heavily focused on the petitioner's prior crime.  The respondent notes that the petitioner's counsel failed to object at that time to the use of this evidence, or to any other portion of the State's arguments, and he did not raise any such claims on appeal. (*Id.* at 3-4.)  Thus, the respondent asserts that any claims of prosecutorial misconduct based upon the use of the prior crime evidence are unexhausted, but also lack merit. (*Id.* at 4.)   The respondent asserts that the prosecutor "made fair deductions and legitimate inferences from the evidence presented." (*Id.*)

In its Order Denying Petitioner's Omnibus Petition for Habeas Corpus Relief, the Circuit Court addressed the petitioner's grounds concerning the admission of the prior crime evidence.  (ECF No. 15, Ex. 9.)  Citing extensively to the transcripts from the *in camera* hearing, the court found that "a proper basis for admission of the Rule 404(b) evidence was given by the State during Mr. Lester's trial." (*Id.* at 24, ¶ 73.)  The court further found that "the Court properly considered the relevancy of the evidence and the probative value against the prejudicial impact on the Defendant" (*id.*, ¶ 74), that "the purpose indicated by the State for use of the Rule 404(b) evidence was not vague, conclusory and unpersuasive as asserted by Mr. Lester (*id.*, ¶ 75), and that "an extensive and exhaustive limiting instruction was given to the jury on two separate occasions during Mr. Lester's trial, wherein the jurors were instructed on the proper considerations to be made regarding the Rule 404(b) evidence." (*Id.* at 25, ¶ 79.)

The Circuit Court further found that the limiting instruction specifically directed the jury not to consider the Rule 404(b) evidence as evidence of the petitioner's

character, but only for the reasons stated in the instructions. (*Id.*, ¶ 80.) Finally, the Circuit Court found that there was no instructional error, that the petitioner suffered no undue prejudice, and that the petitioner's due process rights were not violated based upon the admission of the prior crime evidence. Thus, the court denied the petitioner's ground for relief. (*Id.,* ¶¶ 82-83.)

The Circuit Court separately addressed the petitioner's claim that the trial court improperly allowed the testimony of Earl Stewart, whose testimony did not line up with the proffer made by the prosecutor concerning the same in the *in camera* hearing. The state habeas court found as follows on this claim:

> The Court FINDS that the Prosecuting Attorney presented to the Court a basis for admission of Mr. Stewart's testimony during the trial that Mr. Lester had previously made statements regarding how he would dispose of a body in a body of water so as to make a determination of the cause of death more difficult.

> The Court FINDS that Mr. Stewart testified during trial of statements allegedly made by Mr. Lester while an inmate at Denmar Correctional Facility to another inmate.

> The Court FINDS that the difference in asserted testimony and the actual testimony did not unduly prejudice Mr. Lester, not did the State's asserted purpose and Mr. Stewart's actual testimony vary to such a degree that the overall purpose of the testimony was unclear.

> The Court FINDS that the basis of the testimony was Mr. Lester's statement regarding the disposal of a body and the actual disposal of a body in the underlying trial.

> Accordingly, Petitioner's asserted ground for relief regarding Earl Stewart's testimony is without merit and the instant Petition is DENIED.

(ECF No. 15, Ex. 9, ¶¶ 87-91.)

The trial court's ruling on the admission of evidence under the state evidentiary rule is a question of state law that is binding on this federal court. Thus, the question before this court is simply whether the admission of such evidence was fundamentally

unfair or a miscarriage of justice. *See Estelle v. McGuire*, 502 U.S. 62, 72-73 (1991); *Montana v. Egelhoff*, 518 U.S. 37, 43 (1996); *Lisena v. California* 314 U.S. 219, 236 (1941) (to prove a due process violation based upon discretionary evidentiary ruling under state law, a petitioner must prove fundamental unfairness resulting in undue prejudice).

The undersigned has reviewed the proffer of evidence and argument from the *in camera* hearing, as well as the trial testimony. The undersigned did not review the trial court's opinion permitting use of the evidence, which is not a part of the record before this court. The undersigned proposes that the presiding District Judge **FIND** that Petitioner has not demonstrated that the admission of evidence concerning his prior murder conviction under Rule 404(b) of the West Virginia Rules of Evidence, or the testimony of Earl Stewart concerning the petitioner's alleged statements of how he would dispose of a body, was fundamentally unfair or a miscarriage of justice and, thus, Petitioner has not demonstrated a violation of his right to due process cognizable in federal habeas corpus. Nor was the limiting instruction given by the trial court concerning this evidence improper to the point of causing undue prejudice to the petitioner's defense.

The undersigned further proposes that the presiding District Judge **FIND** that the state habeas courts' rulings denying habeas corpus relief on these claims were neither contrary to, nor an unreasonable application of, clearly-established federal law, and that the respondent is entitled to judgment as a matter of law on Grounds One, Two, Three and Four of the petitioner's section 2254 petition.

### B.    Ground Five – Gruesome photographs.

In Ground Five of his section 2254 petition, the petitioner contends that his due process rights were violated when the trial court allowed the admission of photographs of the victim taken after his body was located in a river approximately three weeks after the alleged date of death.  The petitioner asserts that these photographs were gruesome and inflammatory to the jury.  (ECF No. 2 at 23-25.)  The petitioner maintains that "there was no controversy over the horrific nature of the murder in this case based upon the testimony of the State's Medical Examiner, Dr. Kaplan."  (*Id.* at 23.)  The petitioner further asserts:

> So, the only conceivable reason the State wanted to place the gruesome photographs into evidence was to inflame the minds of the jurors against Mr. Lester and his defense counsel.  Thus, introduction of State Exhibits 7A through E "gruesome photographs" which are inflammatory for reasons unrelated to the charge, and serve no purpose in connection with the jury trial is improper, and by law reversible trial error.  As this is the legal issue in the petitioner's case herein.

(*Id.*)

The petitioner's defense counsel objected to the admission of the photographs prior to the trial, and the trial court denied the admission of some, but not all, of the photographs.  (ECF No. 15, Ex. 11 at 12-15; ECF No. 15, Ex. 12 at 15-21.).  The petitioner contends that, in West Virginia, a gruesome photograph must meet the higher standard of admission under *State v. Rowe*, 259 S.E.2d 26 (W. Va. 1979), which requires that the photographs have "substantial probative value."  (*Id.* at 24.)  The petitioner argues that state law mandates that the photographs be of "essential evidentiary value to the case," and "at the very least, depict conditions that existed at the time of the relevant event." (*Id.*)

The petitioner asserts that the State did not meet this high threshold of admission, and that the trial court erred in admitting the photographs, which, as characterized by the petitioner, depicted "a dead body that had been submerged in water for a period of up to 21 days after the original time of death ruling was determined to be on April 1, 2004, as a result of blunt force trauma according to the State Medical Examiner." (*Id.*)  The petitioner emphasizes the effect that being in the water had on the color and condition of the body.  (*Id.* at 24-25.)

The respondent's Memorandum of Law in support of his Motion for Summary Judgment reiterates this claim for relief is grounded in state evidentiary law, and can only be cognizable in federal habeas corpus if the petitioner can demonstrate that the admission of the photographs was fundamentally unfair or a miscarriage of justice. (ECF No. 19 at 35.)  The respondent cites to a Sixth Circuit case in which the court found that it was not fundamentally unfair to admit photographs depicting a victim's severed head, severed breast and torso, where proper cautionary instructions were given.  *See Biros v. Bagley*, 422 F.3d 379, 391 (6th Cir. 2005).  (*Id.*)

The respondent further asserts that, in the instant case, the petitioner has not offered any evidence to demonstrate that the admitted photographs were objectively unreasonable in fact or law.  (*Id.*)  The trial court, after reviewing the photographs *in camera*, admitted five of them, which the court believed illustrated the nature of the victim's injuries to his face and head for the jury.  (*Id.* at 36.)  The respondent further asserts that the petitioner's argument that the photographs did not accurately depict the victim at the time of his death goes to the weight of the evidence, not its admissibility. (*Id.* at 37.)  The respondent contends that there is no support to conclude that the injuries depicted or the changes in the victim's body mislead the jury.  (*Id.*)

The petitioner's response to the Motion for Summary Judgment asserted that the subject photographs were not part of the record before this court, and that a fair determination of this claim for relief could not be made without them.  (ECF No. 30 at 19.)  The photographs have subsequently been made a part of the record.  (ECF Nos. 38 and 39.)  The petitioner did not elaborate on this claim.

The respondent's Reply once again emphasizes that this claim involves an issue of state law that is not cognizable absent a showing of fundamental unfairness.  (ECF No. 40 at 4-6.)  The Reply states:

> This issue before this Court is not whether it subjectively believes the photographs were gruesome.  The admission of gruesome photos, even if mistaken under state law, does not prove a due process violation.  [Citing *Biros, supra*]  Indeed, under state law the admissibility of photographs is not based upon their gruesomeness, but upon probative value.  *See* Syl. pt. 10, *State v. Derr*, 451 S.E.2d 731 ([W. Va.] 1994) (trial court must first determine whether photo is probative under Rule 401 & 402, it must then balance the probative nature of the photo against the danger of unfair prejudice under Rule 403).

> In this case, defense counsel objected to the admissibility of certain photographs as unnecessarily gruesome.  He also claimed that the medical examiner's testimony obviated the need for these photos.  The trial court excluded certain photos but admitted the rest.  Defense counsel's objections were without merit.  It is the State that bears the burden of proof in these matters, not the defendant.  Thus, the defendant cannot dictate how the state will present its evidence to the jury.  *See Thornburg v. Mullin*, 422 F.3d 1113, 1129 (10th Cir. 2005) (no due process violation where the petitioner challenged the admission of six photographs depicting the charred remains of the victim's bodies despite the fact that the petitioner did not dispute the manner of death as the state still bore the burden to convince the jury that its witnesses, both eyewitness and expert, provided an accurate account of events.)

> The photos were obviously probative, as they depicted the nature of the victim's wounds in a manner which corroborated several of the state witnesses' testimony regarding the manner of death and the condition of the body.  There is no doubt that these photos do present a vivid depiction of the Petitioner's handiwork, but their probative value far outweighs the danger of unfair prejudice.  A call wisely entrusted to the sound discretion of the trial court judge under state law.

44

(*Id.* at 5-6.)

Citing to *State v. Derr*, 451 S.E.2d 731 (W. Va. 1994), the state habeas court's Order Denying the Petitioner's Omnibus Habeas Corpus Petition stated that "gruesomeness alone does not justify the exclusion of the photographs from a trial. The exclusion is justified only if the prejudicial effect outweighs the probative value of the photographs." (ECF No. 15, ex. 9 at 17, ¶ 46.) The state habeas court found that the trial court made a proper relevancy determination of each photograph and conducted a proper balancing test under Rules 401, 402 and 403 of the West Virginia Rules of Evidence prior to admitting the five photographs that were presented to the jury. Thus, the state trial court found no error under state law, and no undue prejudice resulting from the admission of the five photographs. Accordingly, the Petitioner has not demonstrated that his trial was fundamentally unfair or marred by any other violation of his federal constitutional rights based upon the admission of post-mortem photographs of the victim at his trial. Therefore, the undersigned proposes that the presiding District Judge **FIND** that the state courts' decisions denying him habeas corpus relief on this basis were neither contrary to, nor an unreasonable application of, clearly established federal law, and that Respondent is entitled to judgment as a matter of law on Ground Five of Petitioner's section 2254 petition.

### C.     Ground Six – Ineffective assistance of counsel.

In Ground Six of his section 2254 petition, the petitioner asserts one claim of ineffective assistance of counsel based upon his trial counsel's failure to conduct independent DNA testing of his clothing and other items collected at the time of his arrest, in comparison to the known sample of the victim, and to call an expert witness to

rebut the evidence presented by the State.  In the Order denying the Petitioner's Motion to Allow Discovery, the undersigned has discussed her belief that this claim has not been exhausted because the petitioner abandoned this claim in his habeas appeal. Nevertheless, the undersigned further believes that this claim lacks merit and will address the substance of the claim below.

In *Strickland v. Washington*, 466 U.S. 688 (1984), the Supreme Court adopted a two-prong test for determining whether a defendant received adequate assistance of counsel.  A defendant must show (1) that counsel's representation fell below an objective standard of reasonableness; and (2) that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 687-91.  Moreover, "judicial scrutiny of counsel's performance must be highly deferential."  *Id.* at 689.  Furthermore, the AEDPA "adds a layer of respect for a state court's application of the legal standard."  *Holman v. Gilmore*, 126 F.3d 876, 881 (7th Cir. 1997).

As discussed in the discovery order, prior to his trial, the petitioner acknowledged that the blood of William Bert Davis might be found on his clothing because of the fist fight that he admitted to engaging in with Mr. Davis on March 12, 2004.  Thus, although the petitioner's counsel, John Mitchell, Sr. filed a motion to conduct DNA testing, he did not pursue the motion and testing because he felt it would be a waste of resources.  The petitioner did not raise any challenge to the DNA testing or blood evidence in his direct appeal.

However, in his Circuit Court habeas petition, the petitioner raised a claim of ineffective assistance of counsel on the basis that Mr. Mitchell did not pursue independent testing or call an expert witness to rebut the State's evidence.   The

petitioner also raised a claim concerning an unlawful search and seizure of his blood. In conjunction with his state habeas proceedings, the petitioner, by court-appointed counsel, filed a motion for DNA testing. Despite the fact that the motion was not made in a verified petition, as required by West Virginia Code § 15-2B-14(a), the Circuit Court addressed and denied the petitioner's request for DNA testing, with a detailed analysis of all of the factors set forth in West Virginia Code §§ 15-2B-14(c)(1)(A)-(E) and (f).

The Circuit Court found that the specific testing method requested by the petitioner (*i.e.*, EDTA testing) was available in 2005, prior to his trial, but was not conducted because the petitioner's trial counsel made a strategic decision that such testing was not necessary. (ECF No. 36-1.)[5] The Circuit Court further found that the EDTA tests, to see if blood preservatives were used on the material, which the petitioner now argues could potentially show that the State Police Crime Lab had planted evidence to frame him, was not likely to result in a material change in the prior DNA testing results. (ECF No. 15, Ex. 9 at 45, ¶¶ 191-192.) Finally, the Circuit Court found that the petitioner failed to satisfy the fifth factor of this nine-factor test - that new testing would raise a reasonable probability that his verdict or sentence would be more favorable if the DNA test results had been available - because the petitioner had previously admitted that the victim's blood was on his clothing and that he engaged in an altercation with the victim. (*Id.* at 45, ¶¶ 188-189.)

The Circuit Court also made the following findings of fact and conclusions of law concerning the petitioner's claim of ineffective assistance of counsel related to the DNA evidence:

---

[5]   This last page of the Circuit Court's order was not included at the time that the remainder of the respondent's exhibits were filed in ECF No. 15. It was subsequently filed and actually appears on the electronic docket as ECF No. 36-1.

- The Court found that the evidence presented at trial indicates that the petitioner's clothing was collected by the Gilbert State Police Detachment and forwarded to the West Virginia State Police Forensic Laboratory.  (ECF No. 15, Ex. 9 at 11, ¶ 9.)

- Trooper Myers testified that he tested samples from the petitioner's clothing, that the samples were not consumed or destroyed, and that the DNA evidence collected was available for repeat testing.  (*Id.* at ¶ 10.)

- Petitioner's trial counsel testified at the omnibus hearing that he did not seek DNA testing because he fully expected the victim's blood to be on the petitioner's clothing.  (*Id.* at ¶ 11.)  More specifically, the Circuit Court found that "Mr. Mitchell testified that he did not conduct independent DNA testing because he did not feel that it would be helpful to Mr. Lester's case, that he hired a private investigator to investigate the case, that he felt that the forensic lab report and autopsy report could be adequately handled on cross-examination and that independent testing and experts were unnecessary, [and] that he presented the necessary witnesses and defenses at trial."  (*Id.* at 34, ¶ 122.)

The Circuit Court then found that Mr. Mitchell's performance during the underlying criminal proceeding was not deficient, and that there is no reasonable likelihood that, but for Mr. Mitchell's strategic decisions, the jury's verdict would have been different. Accordingly, the Circuit Court denied habeas corpus relief on the petitioner's ineffective assistance of counsel claim.  (*Id.* at 35, ¶¶ 129-133.)

The petitioner abandoned all claims concerning the DNA evidence and ineffective assistance of counsel in his state habeas appeal.  Rather, the petitioner raised only claims concerning the admission of his prior crime evidence under Rule 404(b), a claim alleging that the photographs of the victim were gruesome, and a claim that the Circuit Court had failed to make specific findings of fact and conclusions of law in its final order concerning the petitioner's habeas corpus petition, as required by the state habeas corpus statute, West Virginia Cod § 53-4A-7(c).  On March 11, 20011, the SCAWV issued a Memorandum Decision affirming the Circuit Court's rulings.  In the Memorandum Decision, the SCAWV stated:

> <u>The Court has carefully considered the merits of each of petitioner's arguments set forth in his petition for appeal</u>, and has reviewed the record designated on appeal.  Finding no error in the denial of *habeas corpus* relief, the Court affirms the decision of the circuit court and fully incorporates and adopts herein, the lower court's detailed and well-reasoned "Final Order Denying Petitioner's Omnibus Petitioner for *Habeas Corpus* Relief" entered on February 9, 2010.  The Clerk of Court is directed to attach a copy of the same hereto.

(ECF No. 15, Ex. 10 at 2.) (Emphasis added).

The respondent's Memorandum of Law in support of his Motion for Summary Judgment (ECF No. 19 at 37-38), and his Response in Opposition to the Petitioner's Motion to Allow Discovery (ECF No. 41 at 7-8), assert that, because the petitioner did not specifically raise his ineffective assistance of counsel claim concerning the failure to challenge the DNA evidence at trial in his state habeas appeal, that claim has not been exhausted or is procedurally defaulted, and is unreviewable.  The petitioner, on the other hand, asserts that, by attaching and incorporating the Circuit Court's Order, the SCAWV considered, *sua sponte*, all of the claims the petitioner had asserted in the Circuit Court, notwithstanding his abandonment of the same in his Petition for Appeal, and that his ineffective assistance of counsel claim was, thus, exhausted.  (ECF No. 30 at 2-7.)

As explained in greater detail in the Order denying the petitioner's Motion to Allow Discovery, the undersigned believes that the petitioner's ineffective assistance of counsel claim was not exhausted in his habeas appeal.  Nevertheless, because the undersigned further believes that the petitioner's ineffective assistance of counsel claim lacks any merit, the undersigned will address the merits of the claim under 28 U.S.C. § 2254(b)(2), which provides that "an application for a writ of habeas corpus may be

denied on the merits, notwithstanding the failure to exhaust the remedies available in the courts of the State."

Throughout his state habeas corpus proceedings, the petitioner has admitted that the victim's blood might be on his clothing because of the altercation he had with the victim on the night of his arrest, but the petitioner asserts that the amount of blood was overstated.  (*See* ECF No. 15, Ex. 8 at 144.)  The petitioner further contends that calling an expert witness at trial could have helped convey this theory and to possibly show that the evidence presented by Trooper Myers was false.  The petitioner's claim in his petition relies heavily on assertions that Trooper Myers had been shown to have lied before and made errors in his reports in the proceedings related to the Fred Zain cases. (ECF No. 2 at 26-27.)

After asserting that this claim is unexhausted, the respondent's Motion for Summary Judgment addressed the merits of this claim as follows:

> The Petitioner claims that defense counsel failed to adequately challenge the State's forensic reports.  He claimed that the State's serology lab submitted two inconsistent reports.  The first report, dated January 6, 2005, misidentified the victim, and stated that both the Petitioner's and an individual named Wade Davis'[s] DNA was found on a shotgun release lever.  (Resp't Ex. 16.)  The victim's name was William Bert Davis, not Wade Davis, and a shotgun was never recovered in the Petitioner's case. The first page of the report lists the items that were tested, names both the victim and the defendant, and the date of delivery (Resp't Ex. 16 at 1.)  The front page also refers to Wade Davis once.  (*Id.*)  Although the opinion section does mistakenly identify the victim as Wade Davis, it also identifies the defendant as Bradley Lester.  The report also contains findings from samples taken from the Petitioner's truck and pants.  (*Id.* at 2.)  The Petitioner is making a mountain out of a molehill.  Clearly, the serologist mixed up the names of William and Wade Davis.  The State claimed the report contained a clerical error.  The State amended the report on February 7, 2005, two weeks before the Petitioner's trial, to correct the error.  Defense counsel had no objections because there were no meritorious objections to be interposed.  (Respt' Ex. 15 at 4; Resp't Ex. 17 at 1.)

It was the Petitioner's position that these clerical errors proved that Trooper Myers had falsified the DNA records in his case. (Resp't Ex. 8 at 152-53.) He did not produce[] a scrap of concrete evidence to support this allegation at his trial or omnibus evidentiary hearings. [Footnote omitted.] At Petitioner's trial Trooper H.B. Myers testified that he received twelve sample from the Petitioner's truck, five from the Petitioner's shirt, one from a bag another from another bag, one from a cooler, three from a left shoe lace, two from a right shoe lace, and one from a right sock. (Resp't Ex. 12 at 76-77.)[6]   He also received reference samples from the Petitioner and the victim. (*Id.*)

He found DNA consistent with the victim from blood samples taken from the Petitioner's truck. He also found DNA consistent with both the victim and the Petitioner from the right shoelace. (Resp't Ex. 12 at 79.) He also found DNA consistent with the victim's on a blood spatter taken from the Petitioner's pants. (*Id.*)   According to the trooper the chances that the DNA from the Petitioner's truck and pants did not belong to the victim [were] 1 in 1.76 quadrillion. (Resp't Ex. 12 at 81.)

(ECF No. 19 at 39-40.)

The respondent further notes that the petitioner called Mr. Mitchell as a witness at his omnibus hearing on February 25, 2008. (ECF No. 15, Ex. 5 at 25.) Mr. Mitchell testified that he filed a pre-trial motion for independent DNA testing, but chose not to have the testing conducted. He acknowledged that the victim's blood could be found on the petitioner's clothing, since the defendant had admitted to the same. (*Id.* at 38.) The respondent notes that Mr. Mitchell vigorously cross-examined Trooper Myers about the inconsistencies in his reports. (Resp't Ex. 12 at 84.) (ECF No. 19 at 40-41.)

The respondent's Memorandum of Law asserts that there is no evidence that, had Mr. Mitchell retained a rebuttal expert witness, such expert would have contradicted any of Trooper Myers's testimony concerning the DNA test results. He emphasizes that the petitioner did not call an expert witness at his omnibus proceedings, and has done

---

[6]  Trooper Myers also apparently received four samples from the petitioner's pants. (Resp't Ex. 12 at 59, 64-65.)

no more than speculate that a defense expert could have somehow rebutted the State's evidence.

The respondent further asserts that the petitioner's claim that the "unnecessarily large" swatches that were cut from his clothing led the jury to erroneously believe that there was a greater amount of blood on his clothing than there actually is without merit. The jury was shown the photographs of the petitioner's clothing before the swatches were taken, and could judge for themselves the amount of blood that may have been visible on the clothing. The respondent asserts that an expert witness would not have been necessary to address that issue. (ECF No. 19 at 41.)

The petitioner's Response in Opposition to the Motion for Summary Judgment (ECF No. 30) asserts that Mr. Mitchell's explanation that he did not pursue independent DNA testing because of the petitioner's admission that some of the victim's blood could be on his clothes because of the fistfight, is inconsistent with his trial strategy to challenge the amount of blood that was supposedly on the clothes. The petitioner claims:

> That strategy may well have been effective had Mitchell been able to show that the holes in the trousers (with one exception) and the holes in the shirt or sweater did not represent Mr. Davis's blood. His failure to subject Lester's garments to appropriate testing for the presence of Davis's blood cannot be excused in light of this trial strategy.

(*Id.* at 10.) The petitioner contends that this tactical decision was unreasonable and, if this federal court would allow him to do additional DNA testing on the evidence, he could show that he has been unduly prejudiced by that decision, if the items are not stained with Mr. Davis's blood. (*Id.* at 11-14.)

The respondent's Response to the petitioner's discovery motion states "[the petitioner's] counsel conceded that his client had admitted to having a physical

altercation with the victim on the day of the murder, and that two witnesses had seen the victim, badly beaten and bloody, in the back of the Petitioner's pick up truck that same day.  (Resp't Ex. 5 at 38, 40.)"  (ECF No. 41 at 15.)  The respondent's Response further asserts:

> The Petitioner claims that independent DNA testing might have demonstrated that the victim's blood was never present on his clothing. He did concede that some of the blood found on his clothes was the result of the fistfight he had with the victim earlier that day, but this small amount of blood was not consistent with the severe injuries inflicted on the victim.  [FN 11]  Trooper Frye testified that he observed blood spatters on the Petitioner's pants and shoes.  He also identified what appeared to be blood on the bed of the Petitioner's pick up.  (Resp't Ex. 11 at 99.) Given the nature of the victim's injuries, the defense argued that there should have been more blood on the defendant's clothing.  [FN 12]  The medical examiner testified that the victim died of multiple blunt force trauma to his head and face.  (Resp't Ex. 12 at 10, 14.)  To bolster his argument, defense counsel introduced photos of the Petitioner's clothing before it was sent to the lab.  [FN 13]  The jury viewed these photos.
>
> [FN 11 – The Petitioner told the officers several different stories about the cause of the victim's death.  (Resp't Ex. 11 at 144.)  None of them involved circumstances that would justify large amounts of the victim's blood on his clothing.]
>
> [FN 12 – Trooper Frye collected the Petitioner's blood spattered clothing, and photographed it .  (Resp't Ex. 11 at 109-10.)]
>
> [FN 13 – These included pictures of the Petitioner's right shoe, pants and sweater.]
>
> Defense counsel's strategy was to convince the jury that the amount of blood recovered from the Petitioner's clothing was not consistent with the injuries the victim received.  Counsel did not argue that the blood on the Petitioner's clothes was not the victim's. * * *

(*Id.* at 15-16.)

Under the circumstances present at the time of the petitioner's trial; that is, that the petitioner had admitted that William Bert Davis's blood could be found on his clothing, and the test results that indicated to a near certainty that Mr. Davis's blood

was found on the petitioner's pants, shoelace, and in the truck bed, after two eyewitnesses gave statements that they had seen the victim, who appeared to be bloodied and severely beaten, in the bed of the petitioner's truck, it was not unreasonable for Mr. Mitchell to make the tactical decision not to further test the evidence, but rather, to mount a defense concerning the amount of blood and the inconsistencies in the reports and testimony provided at trial.

Based upon the evidence of record, the undersigned proposes that the presiding District Judge **FIND** that the petitioner has failed to demonstrate that his counsel's conduct fell below an objective standard of reasonableness, and that he cannot successfully establish a claim of ineffective assistance of counsel on this basis.  The undersigned further proposes that the presiding District Judge **FIND** that the state court's denial of habeas corpus relief on this basis was neither contrary to, nor an unreasonable application of, clearly established federal law, and that the respondent is entitled to judgment as a matter of law on Ground Six of the petitioner's section 2254 petition.

<u>**RECOMMENDATION**</u>

For the reasons stated herein, it is respectfully **RECOMMENDED** that the presiding District Judge **GRANT** the respondent's Motion for Summary Judgment (ECF No. 15) and dismiss this civil action from the docket of the court.

The parties are notified that this Proposed Findings and Recommendations is hereby **FILED**, and a copy will be submitted to the Honorable Joseph R. Goodwin, United States District Judge.  Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days

(service/mailing) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection.  Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the district court and a waiver of appellate review by the circuit court of appeals.  *Snyder v. Ridenour*, 889 F.2d 1363, 1366 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Wright v. Collins*, 766 F.2d 841, 846 (4th Cir. 1985); *United States v. Schronce,* 727 F.2d 91, 94 (4th Cir. 1984).  Copies of such objections shall be served on the opposing party and Judge Goodwin.

The Clerk is directed to file this Proposed Findings and Recommendation and to transmit the same to counsel of record.

_____February 12, 2013_____
            Date

Mary E. Stanley
United States Magistrate Judge